UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

```
* * * * * * * * * * * * * * *
UNITED STATES OF AMERICA      *
                              *
versus                        *        Case No. 8:19-cr-181
                              *
RICHARD LAMOND LONGSHORE      *        March 19, 2019
                              *
* * * * * * * * * * * * * * *
```

REPORTER'S OFFICIAL TRANSCRIPT OF THE
DETENTION HEARING HELD BEFORE THE
HONORABLE KEVIN F. MCDONALD
UNITED STATES MAGISTRATE JUDGE
MARCH 19, 2019

Appearances:

For the United States:          U.S. Attorneys Office
                                BY:  Leesa Washington
                                55 Beattie Place
                                Suite 700
                                Greenville, SC  29601
                                864.282.2100

For the Defendant:              Boggs Law Firm
                                BY:  Cameron G. Boggs
                                PO Box 65
                                Greenville, SC  29602
                                864.233.8066

RECORDED BY ASHLEY BUCKINGHAM
TRANSCRIBED BY TANA J. HESS
U.S. District Court Reporter
District of South Carolina
85 Broad Street
Charleston, SC  29401
843.779.0837
tana_hess@scd.uscourts.gov

1                          **INDEX**

2    **NAME**                                          **PAGE**

3    Randy Smith

4          Cross-Examination by Mr. Boggs               23

5          Redirect Examination by Ms. Washington       34

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **MS. WASHINGTON:**  Good morning, Judge.

2        **THE COURT:**  Good morning.

3        **MS. WASHINGTON:**  The next case is United States of

4   America versus Richard Lamond Longshore.  It's docket number

5   8:19-181.  Mr. Longshore is present in the courtroom with

6   counsel.

7             Judge, we're here on the defendant's motion --

8   I'm sorry, on the Government's Motion for Detention.

9   Mr. Longshore was arrested February 26th.  At that time the

10  Government moved for detention.  At Mr. Longshore's scheduled

11  detention hearing, the defendant waived bond.  The defendant

12  has since filed a Motion for Bond, so I guess we're here to

13  follow through with that detention hearing.

14       **THE COURT:**  Okay.  All right.  Is the Government

15  ready to go forward?

16       **MS. WASHINGTON:**  Yes, sir.  The Government can either

17  proffer or -- whatever suits the defendant; proffer the

18  Government's evidence and make the case agent, Randy Smith,

19  available for cross-examination, or I can just put him up and

20  cross -- or direct -- the direct, and he can cross-examine him.

21       **THE COURT:**  Okay.  Yes, sir, Mr. Boggs, do you have a

22  preference?

23       **MR. BOGGS:**  Knowing both parties involved, we're fine

24  with a proffer.  Since Mr. Smith is here -- I'm hearing some of

25  this for the first time.  They have given me discovery.

1          THE COURT:  Uh-huh.

2          MR. BOGGS:  But it's quite voluminous, and it's being

3    copied right now at my office, so --

4          THE COURT:  I have no problem if you want to --

5          MR. BOGGS:  I know, Judge.

6          THE COURT:  -- talk to a witness on the stand.

7          MR. BOGGS:  Well, I don't know that I'll need to.  It

8    depends on what they proffer.

9          THE COURT:  Okay.

10          MR. BOGGS:  But I have no problem with a proffer --

11          THE COURT:  Okay.

12          MR. BOGGS:  -- since he's here to sort of -- if

13    necessary.  So --

14          THE COURT:  Okay.  Well, if you change your --

15          MR. BOGGS:  We're not trying to delay, I mean

16    obviously.

17          THE COURT:  If you change -- if you change your mind,

18    you just let me know.

19          MR. BOGGS:  Yes, sir.

20          THE COURT:  Okay.  All right.  Yes, ma'am?

21          MS. WASHINGTON:  Your Honor, Mr. Longshore and ten

22    others were charged in an indictment returned by a Federal

23    Grand Jury in this District on February 19th, 2019.  As I

24    stated, Mr. Longshore and others were arrested on the 26th of

25    this month.

1          Judge, Your Honor -- I'm sorry.  Your Honor,
2    Mr. Longshore is charged in Counts 1 and 13.  Count 1 charges a
3    violation of Title 21 United States Code Section 846.  The
4    drugs involved include cocaine, heroin, and a substance
5    commonly known as fentanyl.
6          Count 13 charges that Mr. Longshore and others
7    operated a stash house, in violation of Title 21.
8          As to Count 1, Mr. Longshore faces a mandatory
9    minimum term of imprisonment of 10 years, and a maximum term of
10   life.  As to Count 13, Mr. Longshore faces a maximum term of
11   imprisonment of 20 years.
12         Judge, the presumption under 3142(e)(3) applies
13   in this case.  The Government relies on the presumption.
14         In addition to that, Judge, the Government
15   relies on Mr. Longshore's current unemployed status.  He's been
16   charged in an indictment that involves the distribution of
17   heroin, fentanyl and cocaine.  The Government believes he is
18   both a flight risk and a danger to the community; a flight risk
19   in that he now faces a maximum term of life as to Count 1 and
20   20 years as to Count 13; a danger to the community in that he
21   was involved in a conspiracy that was responsible for
22   distributing -- distributing heroin tablets.  Tablets that were
23   seized both contained heroin and fentanyl, a particularly
24   dangerous drug these days and probably has been for a while
25   now, more prevalent these days.

1          As Your Honor may be aware, even one dosage --
2   and our evidence is that Mr. Longshore, his brother,
3   Mr. McGowan, and others manufactured tablets from both
4   products, heroin, fentanyl and other materials that are at this
5   point still unknown to the Government as to what exactly those
6   materials contained.

7          Because the substances are unknown, they're
8   particularly dangerous in that a user may or may not know what
9   he's taking, may assume he's taking oxycodone or -- oxycodone
10  and instead gets a lethal dose of the tablets that this
11  defendant and Mr. McGowan and others were responsible for
12  distributing.

13         Judge, the investigation began by local law
14  enforcement in Greenwood in 2016 or around 2016 when
15  authorities in Greenwood County noticed an increase in the
16  number of opioid-related overdoses and opioid -- and overdose
17  incidents, being that the result was fortunately not a
18  fatality.

19         Local law enforcement began conducting
20  controlled purchases, trash pulls, confidential sources, and
21  identified this defendant, Mr. McGowan, and others as
22  manufacturers and distributors of these blue tablets.

23         The tablets that they found most prevalent in
24  the -- at the scenes that they visited or were called to
25  respond to were -- looked like 30 milligram tablets of

oxycodone or some other prescription drug.

The thing about these tablets were that they were stamped with a V on one side, and on the other side, the stamp or the print was 4812.  For what it's worth, Your Honor, Mr. McGowan has been interviewed briefly.  At least according to him -- and I would say that the Government does not rely on most of the information that Mr. McGowan presented or proffered to the agents during the interview, post-arrest interview.  At least according to him though, he believes that he was one of the only ones in and around Greenwood County that had that stamp or that used that stamp to manufacture pills.

Judge, in September --

THE COURT:  What did -- I'm just curious.  What did that stamp indicate?  What does that mean?

MS. WASHINGTON:  It's a stamp that's used to print an imprint on the pills, both sides.  One says V, the letter V.  One side is stamped V.  The other side is stamped 4812.

THE COURT:  So what's the significance of the number?

MS. WASHINGTON:  It has no significance.

THE COURT:  Okay.

MS. WASHINGTON:  It's just a label, some -- as in some cocaine cases, drug traffickers imprint their stamp so that they can say, "Well, this -- I know this is of a certain quality, because it has my stamp on it.  The source of this particular drug stamped V 4812 produces better drugs than

another source might."

        **THE COURT:**  Okay.

        **MS. WASHINGTON:**  The significance also, Your Honor, is that this defendant -- is that Mr. McGowan takes credit for producing a large amount of tablets with that particular stamp on it.

        In September of 2017, Greenwood Police Department along with SLED made a number of controlled purchases from an individual who is currently serving a sentence in the South Carolina Department of Corrections. There were I believe five to six purchases in total in October 2017, about 300 tablets.  That individual was arrested, cooperated somewhat with law enforcement, provided a cell phone, and identified Mr. Longshore as the source of the tablets that he had purchased.

        In September 2017, the Greenwood Police Department conducted a trash pull at 209 Vintage Court, which is Mr. Longshore's residence.  It is the residence where he was arrested on the 26th of this month.  During the trash pull or as a result of the trash pull, the agents recovered two fentanyl-laced blue tablets which were also stamped V on one side and 4812 on the other.

        The 300 tablets that were purchased by SLED in October 2017 were also stamped V on one side and 4812 on the other.

1          Going forward, Judge, the investigation, local
2    law enforcement again working with the FBI, later on with DEA,
3    and in September of last year, DEA Greenville received
4    information from their counterparts in New Mexico, Las Cruces,
5    New Mexico.  A confidential source working with that office had
6    been contacted by an individual, Mr. Latimer, Jamal Latimer,
7    who is also charged in Count 1 of the indictment, looking to
8    purchase a significant quantity of heroin and cocaine.
9    Mr. Latimer specified that -- the quantity of heroin that he
10   wished to purchase, which was at least 10 kilograms.  He
11   specified Chinawhite and told the agents -- at that point he
12   was talking to agents rather than the confidential source.  He
13   contacted a confidential source.  That confidential source
14   related the information to local -- the law enforcement in Las
15   Cruces.  Las Cruces DEA employed an undercover to make -- to
16   return Mr. Latimer's call.  During the recorded calls and the
17   subsequent recorded meetings, Mr. Latimer sought to purchase at
18   least 10 kilograms of heroin and 10 kilograms of cocaine.  He
19   specified Chinawhite heroin and also told the agents during the
20   recorded conversations, both in person -- as Mr. Latimer
21   eventually made a trip out to New Mexico or El Paso to meet
22   with this source whom he believed was prepared to supply him
23   with the cocaine and heroin from Mexico.  Instead, unbeknownst
24   to Mr. Latimer, he was meeting with undercover DEA agents.
25          During that recorded meeting, which occurred on

1    October 3rd of last year, Mr. Latimer specified Chinawhite and
2    specifically asked whether or not -- what the consistency was,
3    whether or not it contained fentanyl, and whether or not it
4    would be useful for the production of heroin or tablets, which
5    he admitted to the undercover agents that's what the
6    individuals he was working with here in South Carolina were
7    producing.
8            Your Honor, that order resulted in the seizure
9    of approximately -- of over a million dollars here in
10   Greenville on October 23rd, 2018.  The agents followed through
11   with Mr. Latimer.  Turned out he was actually serious about
12   this significant purchase.  The agents traveled to South
13   Carolina.  During the back and forth about where to meet and
14   where to deliver the supposed heroin and cocaine, Mr. Latimer
15   produced -- or a traffic stop ensued, and Mr. Latimer was found
16   in possession of $760,000.  Another car belonging to
17   Mr. Thomas, who was also charged in Count 1 of the indictment
18   along with Mr. Longshore, in that car there was approximately
19   $248,000.  Combined, Judge, the cash amounted to over a million
20   dollars.
21           After which subsequent conversations and tolls
22   records from telephones confirmed the individuals involved in
23   the transaction or the supposed transaction that was scheduled
24   to take place in October as Detric McGowan, Jamal Latimer,
25   Christopher Cunningham, and Donald Thomas, all of which were

1    charged along with Mr. Longshore in Count 1 of the indictment.

2                Your Honor, after that traffic stop ensued and

3    the cash was seized, agents continued their investigation,

4    applied for and received authorization for wiretaps over

5    multiple phones used by members of the conspiracy.

6                In December of 2018 prior to the beginning of

7    interception over the wiretap, agents seized approximately

8    10,000 fentanyl-laced pills supplied by Mr. Latimer to an

9    individual in Charlotte, North Carolina.  Agents confirmed the

10   delivery of those 10,000 pills to the individual in North

11   Carolina via wiretap that later was approved in late December

12   2018.

13           **THE COURT:**  It was discussed on the wiretap?

14           **MS. WASHINGTON:**  It was discussed on the wiretap

15   between Mr. Latimer and Mr. McGowan.

16           **THE COURT:**  Okay.

17           **MS. WASHINGTON:**  At that point, Your Honor, there

18   was -- interception was occurring over Mr. Latimer's telephone.

19                January 28th, Judge, during interception over

20   Mr. McGowan's phones or one of Mr. McGowan's phones, the

21   officers learned of another delivery scheduled to take place

22   just outside of Columbia.  Mr. McGowan negotiated and arranged

23   the transaction.  He was selling the pills at that point to an

24   individual out of Fayetteville, North Carolina.  The meet

25   location was just outside the Columbia.  Agents set up

surveillance.  That led to a stop and a seizure of
approximately 1500 grams of heroin, which was the -- is the
equivalent of about 1400 pressed blue pills.  Those pills,
along with the pills that were seized by officials in North
Carolina on December 18th, 2018, all were imprinted with V on
one side and 4812 on the other side.

During the interception of calls over one of
Mr. McGowan's phones, the agents intercepted several
conversations -- I believe there are a total of at least about
60 -- between this defendant, Mr. Longshore, and Mr. McGowan,
drug-pertinent conversations, Your Honor.

During the interception over one of
Mr. McGowan's phones, the agents were able to identify a
location in Mountville, South Carolina that they believe was
being used by Mr. McGowan and Mr. Longshore to manufacture
pills.  Agents set up surveillance and confirmed actually that
this was a location used for that purpose, both by virtue of
listening to telephone calls over the wire, physical
surveillance, and a camera that was installed near the wood
line, installed by law enforcement near the wood line of that
property in Mountville.

The agents actually intercepted calls during
which Mr. Latimer -- or I'm sorry, Mr. McGowan believed at one
point that he had actually seen law enforcement, thought they
were being surveilled by law enforcement.  Mr. McGowan and

Mr. Longshore made a series of telephone calls between the two of them trying to identify whether or not the individual they thought was law enforcement was actually law enforcement. Those conversations were a captured over the wiretap. It actually turned out unbeknownst to these two, unbeknownst to Mr. Longshore and Mr. McGowan, there was actually a law enforcement agent conducting physical surveillance of the property in Mountville, South Carolina.

At some point during the interception of phone calls over Mr. McGowan's telephone, the agents also intercepted a call during which Mr. McGowan actually physically saw the camera, the law enforcement installed camera in the wood line behind the stash house in Mountville. So the agents were able to physically see Mr. McGowan, to see Mr. McGowan see the camera or discover the camera, and also to hear him talk about the fact that he discovered a camera. The camera produced a live feed back to the DEA office here in Greenville.

While the agents -- or at the time that Mr. McGowan discovered the camera, Mr. Longshore was also present at the Mountville stash house. He along with Mr. McGowan went outside and tried to figure out exactly what it was, who had installed it, whether or not it was a law enforcement surveillance camera. While they were taking the camera down and inspecting it, they took it -- or after they took the camera down and inspected it, they actually took it

1  into the stash house.  The camera caught -- or DEA was able to
2  watch a live feed of Mr. McGowan and Mr. Longshore discussing
3  the source of the camera and whether or not it was law
4  enforcement-related.  At the same time they were able to see
5  some of the items that were inside the stash house.  They
6  observed powdered substances, were not able to make out whether
7  or not there was actually a pill press located inside the
8  house, but they actually did see items -- other items
9  consistent with manufacturing tablets.
10          **THE COURT:**  Just to make clear, the -- you indicate
11  that the DEA or someone had installed a camera outside a
12  location.  Mr. McGowan spotted the camera.  He and
13  Mr. Longshore -- it's alleged by the Government -- took the
14  camera down and took it inside the --
15          **MS. WASHINGTON:**  Mountville stash house.
16          **THE COURT:**  -- the Mount -- and the camera continued
17  to operate?
18          **MS. WASHINGTON:**  The camera continued to roll.
19          **THE COURT:**  So it gave a live feed back to DEA?
20          **MS. WASHINGTON:**  Yes, sir.
21          **THE COURT:**  Okay.  All right.  And there was audio
22  capability on that as well?
23          **MS. WASHINGTON:**  Was there audio?
24          **SPECIAL AGENT SMITH:**  No, sir, there was no audio.
25          **THE COURT:**  Okay.

1          **MS. WASHINGTON:**  I'm sorry, Judge.

2          **THE COURT:**  All right.

3          **MS. WASHINGTON:**  After the camera was located, as

4    expected Mr. McGowan and Mr. Longshore discussed finding a

5    new --

6          **THE COURT:**  Can I interrupt you again?

7          **MS. WASHINGTON:**  Sure.

8          **THE COURT:**  In my notes -- I was taking notes here --

9    you said that -- I had a note here that audio was captured, but

10   it wasn't captured in that format; is that right?

11         **MS. WASHINGTON:**  The audio regarding the location --

12   or locating the camera was captured over the wiretap on

13   Mr. McGowan, on one of Mr. McGowan's telephones.  So there were

14   calls -- while there was no conversation recorded over the

15   camera --

16         **THE COURT:**  Right.

17         **MS. WASHINGTON:**  -- there were conversations back and

18   forth with Mr. Longshore and McGowan and McGowan and others

19   discussing the discovery of the camera and whether or not it

20   was installed by law enforcement.

21         **THE COURT:**  Understood.

22         **MS. WASHINGTON:**  Yes, sir.

23         **THE COURT:**  Thank you.

24         **MS. WASHINGTON:**  After the camera was discovered, of

25   course, that generated a lot of conversation over the wiretap

1    between Mr. McGowan and Mr. Longshore about whether or not they
2    had been detected by law enforcement.
3                Judge, this happened in very close time period
4    with the discovery or what they believe -- not actually the
5    discovery.  Mr. Longshore and Mr. McGowan believed they had
6    been being physically surveilled by law enforcement.  Between
7    January 30th, 2019 and February 5th, 2019, they were both
8    suspicious that they were -- had been detected by law
9    enforcement by virtue of physical surveillance and by virtue of
10   finding a camera that they did not -- could not identify the
11   source of.
12               After the camera was located on February 5th,
13   2019, there were multiple calls between Mr. McGowan and
14   Mr. Longshore regarding whether or not they needed to find
15   another spot.  Eventually they did.  Another location was
16   located -- was found in Laurens County.
17               There was a conversation that was intercepted on
18   February 5th between Mr. Longshore and Mr. McGowan during which
19   Mr. Longshore on his own initiative told Mr. McGowan that he
20   had been in touch with at that point an unknown individual who
21   said that they could use his -- the unknown individual's -- RV.
22   They discussed the benefits and downsides of using an RV, how
23   they would use it, whether or not it was a good idea.
24   Eventually Mr. McGowan and Mr. Longshore decided to move the
25   operation to a shed in Laurens County.

1            I would add, Judge, when Mr. -- when the arrest
2   took place on February 26th of this year, law enforcement also
3   executed three search warrants.  One of the search warrants was
4   for the Mountville residence.  Well, actually it wasn't a
5   residence.  It's a house, but no one was living there, and it
6   wasn't used for any residential purposes.  They executed a
7   search warrant at the Mountville property, and they also
8   executed a search warrant at the Laurens property.  It was a
9   shed on the residential property of an individual who has not
10  been charged to date.  That individual, that property owner in
11  addition to a trailer and a shed that's located on his
12  property, that individual also had an RV.  The Government
13  believes that that was the substance of Mr. Longshore's call to
14  Mr. McGowan on February 5th, 2019 where he said he had actually
15  reached out to find another spot, and one of those spots that
16  he suggested would -- was this property owner in Laurens' RV.
17            **THE COURT:**  Okay.
18            **MS. WASHINGTON:**  Turns out that Mr. McGowan and
19  Mr. Longshore did not use the RV.  Instead they used the shed.
20            During the execution of the search warrants at
21  both the Mountville property and the Laurens property, the
22  agents discovered kilograms of substances that have yet to be
23  determined.  They've been shipped off to the DEA lab for
24  identification, but multi-kilogram quantities of this substance
25  was found in the Laurens, South Carolina --

1        **THE COURT:**  Suspected drug substances?

2        **MS. WASHINGTON:**  Suspected drugs, yes, sir, was found

3   in the Laurens, South Carolina stash house.

4             In the Mountville stash house or building that

5   was previously used by McGowan and Longshore to manufacture

6   pills, the officers found -- didn't find any significant

7   quantities of drugs, but they found residue of what is believed

8   to be the residue left behind from the manufacturing of

9   heroin/fentanyl pills.

10            Your Honor, during the initial stages of the

11   investigation, officers were also able to review some of

12   Mr. McGowan's financial records.  Grand Jury subpoena was

13   issued for both bank records, tax returns, and a Court order

14   was issued.  During a review of Mr. McGowan's bank records, two

15   transactions were discovered, two 2017 transactions were

16   discovered that were of particular interest, and those two

17   transactions were debits to a Chinese company who has been

18   identified in multiple criminal investigations around the

19   country as a supplier of pill press -- presses and pill

20   pressing equipment.  The items that were purchased by

21   Mr. McGowan during the two transactions in 2017 were consistent

22   with replacement parts for a pill press machine that's capable

23   of manufacturing 5,000 pills an hour.

24        **THE COURT:**  Okay.

25        **MS. WASHINGTON:**  When Mr. McGowan -- lastly, Judge,

1    about the Laurens Road stash house, the property owner has been

2    interviewed or was interviewed beginning on February 26th and

3    has told law enforcement that on multiple occasions he observed

4    Mr. Longshore and Mr. McGowan at the shed.  While he did not

5    observe the two physically or actually manufacturing pills, he

6    did observe the two wearing face masks, which is commonly used

7    by traffickers who manufacture pills in order to protect

8    themselves from ingesting the fumes and dust that could -- that

9    using a pill press produces.

10                   In addition, Your Honor, multiple calls

11   intercepted over Mr. McGowan's -- during multiple calls

12   intercepted over Mr. McGowan's phone, the agents heard, were

13   able to hear, the consistent -- and I'm just describing it the

14   way they described it.

15                   **THE COURT:**  Yes, ma'am.

16                   **MS. WASHINGTON:**  The consistent, rhythmic sound of a

17   machine operating.  There were also several calls intercepted

18   during which Mr. McGowan's voice was muffled.  Those -- the

19   instances of the calls where Mr. McGowan's voice was muffled

20   and the operation or the sound of a machine running occurred

21   during several calls at the same time, which means -- that may

22   be a bit confusing.  They intercepted several calls during

23   which they heard at the same time a muffled voice of

24   Mr. McGowan's and the operation of a machine.

25                   When Mr. Longshore was arrested at his

residence, 209 Vintage Court in Greenwood, on February 26th,
the agents seized from him over $57,000 in cash; a ballistic
vest.  Mr. Longshore has been convicted of a felony drug
conviction.  That conviction occurred in 1998.  Mr. Longshore
and Mr. McGowan on February 26th, they were arrested at
different locations, Mr. McGowan at his residence in Piedmont
and Longshore in Greenwood.

             At the time of each of their arrests, the agents
questioned both individuals regarding the pill press.
Mr. McGowan suggested to the officers who questioned him that
they should talk to his brother and pointed them to
Mr. McGowan -- I'm sorry, pointed them to Mr. Longshore.  When
Mr. Longshore was arrested and asked about the location of the
pill press, the actual machine -- because it was not at that
point found at either stash house, although it had been heard
in the days leading up to the arrest on February 26th in the --
at the Laurens Road location -- I'm sorry, the Laurens County
location.  When Mr. Longshore was arrested on the 26th at his
home in Greenwood, he was asked about the location of the pill
press.  Mr. Longshore did exactly what Mr. McGowan did and
pointed them in the direction of his brother.  So we had both
of whom -- individuals pointing a finger at the other regarding
the location of the pill press.

             Judge, I think I've mentioned in addition to the
presumption that the Government relies on the strength of the

1    Government's case, and I've tried to lay out as succinctly as I
2    could -- can some of the Government's evidence against this
3    defendant and the members of the conspiracy as a whole.  And,
4    Your Honor, the Government does believe -- or takes the
5    position that Mr. McGowan, Mr. Longshore, and all the
6    individuals charged in Count 1 of the indictment charged as a
7    unit, as a member of a conspiracy, the Government's position is
8    that any act committed by Mr. McGowan, Mr. Longshore, or any of
9    the other individuals were done in furtherance of the
10   conspiracy described in Count 1 of the indictment.
11              The Government relies on the strength of the
12   Government's case, Your Honor, as well as Mr. -- as well as the
13   presumption in that Mr. Longshore is a flight risk or is
14   presumed to be a flight risk and a danger to the community.
15   When the presumption applies, Judge, the defendant must produce
16   some evidence sufficient to convince the Court that he is
17   neither a danger to the community nor a flight risk.  That
18   burden is on the defendant.
19              The Government believes that the Government's
20   evidence in this case is considerable as to both elements, that
21   he is a flight risk and a danger to the community, and for
22   those reasons, the Government believes that this defendant
23   should be detained pending trial.
24              **THE COURT:**  All right.  Thank you very much.
25              Mr. Boggs, are you satisfied with that proffer,

1  as far as do you want to speak to a witness about it or stand
2  on the proffer that's been presented?
3          MR. BOGGS:  Judge, I do have a few questions for
4  their lead officer, just to --
5          THE COURT:  Sure.
6          MR. BOGGS:  -- clarify some of the points she made,
7  because, you know, I know she painted a broad picture, but I'm
8  here for him.
9          THE COURT:  I understand.
10          MR. BOGGS:  And I want to make sure --
11          THE COURT:  I understand.
12          MR. BOGGS:  -- what she said can be interpreted the
13  way I want to argue it to the Court.  So either I can proffer
14  what my argument, and if she -- and by that, I mean I can
15  assume -- but assumptions can be dangerous; right, Judge?
16          THE COURT:  Well --
17          MR. BOGGS:  Or I can ask Agent Smith to confirm what
18  I think I heard, and by that I mean my client's involvement or
19  not in certain activities.  Since she painted this broad
20  picture, I think I need to address the broad picture and then
21  talk about Richard Longshore.
22          THE COURT:  Okay.
23          MS. WASHINGTON:  Special Agent Smith is here, Judge,
24  to answer any questions the defendant had.
25          THE COURT:  Okay.  You want him to come to the

1    witness stand, or do you want to --

2            **MR. BOGGS:**  We can do it informally --

3            **THE COURT:**  Let's do that.  Why don't you come

4    forward?  I mean, you've heard the proffer.  Unless you want to

5    go through everything with him -- you're certainly welcome to

6    do that -- but you can direct specific questions to him, okay?

7            **MR. BOGGS:**  Just direct specific questions.

8            **THE COURT:**  Can you come forward and be sworn, sir?

9            **COURTROOM DEPUTY:**  Please raise your right hand and

10   state your name for the record.

11           **THE WITNESS:**  Randy Smith.

12                    (Witness sworn.)

13           **THE COURT:**  Thank you, sir.  If you'd have a seat

14   right there, and ask -- answer any questions from counsel.

15                    **RANDY SMITH,**

16   a witness called on behalf of the Government, being first duly

17   sworn, was examined and testified as follows:

18                    **CROSS-EXAMINATION**

19                    **BY MR. BOGGS:**

20   **Q.**   Is it Special Agent, or what's your title now?

21   **A.**   Special Agent.

22   **Q.**   Special Agent Smith, after hearing the proffer of the

23   Government, and I'm assuming since you're here, you were the

24   source of -- can confirm or deny those things.  Is there any

25   evidence that my client participated in the purchases that were

## SPECIAL AGENT SMITH - CROSS-EXAMINATION

1  described from New Mexico, I believe it was involving a

2  Mr. Latimer?

3  **A.**   Was there any indication that --

4  **Q.**   Mr. Longshore participated in the transaction that

5  occurred with the folks out in New Mexico or Texas.

6  **A.**   No.

7  **Q.**   Okay.  Is there any indication that -- well, is there any

8  indication of any deaths that have occurred as a result of

9  any -- do you have any evidence of any deaths that occurred

10  from 4812 pills?

11  **A.**   I think the initial investigation through Greenwood County

12  Sheriff's Office and the Greenwood Police Department, what got

13  their attention on the blue fentanyl heroin pills was the fact

14  that they had a massive increase in overdoses.  Now, whether or

15  not -- if those overdoses led specifically to deaths, I really

16  can't recall.

17  **Q.**   Okay.  But it's your investigation that started in 2017

18  when my client allegedly sold 300 tablets to a person who

19  identified him who is still at SCDC; is that your

20  understanding?

21  **A.**   Our -- the DEA investigation really started in September

22  of 2018, and once we got involved with that aspect of the

23  investigation, we learned of what SLED did in 2017.

24  **Q.**   But you -- it was presented today at this detention

25  hearing a year prior to your involvement, my client was

**SPECIAL AGENT SMITH - CROSS-EXAMINATION**

1  identified as selling 300 tablets.  Was he ever arrested for
2  that?
3  **A.**    No, he was not.
4  **Q.**    Okay.  Do you have any reason why he wasn't arrested for
5  that?
6  **A.**    I have no knowledge of that.
7  **Q.**    Okay.  Was it your decision not to arrest him for that?
8  **A.**    No, it was not.
9  **Q.**    Okay.  Was it anybody at the DEA?
10  **A.**    No.
11  **Q.**    Okay.  All right.  Mr. Cunningham, was he involved in
12  selling and -- selling the fentanyl or the pills that contained
13  fentanyl?
14  **A.**    I did not believe so.
15  **Q.**    Okay.  What is his involvement?
16  **A.**    I think primarily his involvement was moving pills to
17  various stash locations.  I know there's phone calls that
18  indicated he might have been moving money, and -- I'm sorry, I
19  do believe he did deliver pills to North Carolina, to Miles.  I
20  believe he was present on a couple of occasions of that.
21  **Q.**    That's Mr. Cunningham; correct?
22  **A.**    Yes.
23  **Q.**    Okay.  Any -- since your involvement in fall of last year,
24  is there any evidence that you have -- and keep in mind, I just
25  got the discovery yesterday, so I haven't been through it all.

## SPECIAL AGENT SMITH - CROSS-EXAMINATION

1    A.    Yes, sir.

2    Q.    But I didn't hear anything this morning about my client

3    delivering any pills; is that your understanding?

4    A.    Your client was involved in receiving pills from McGowan

5    and manufacturing the pills and packaging the pills, and it's

6    my understanding the investigations showed that he was

7    distributing pills in Greenwood.

8    Q.    But that -- my question was specifically since your

9    involvement.  Obviously we just talked about the 2017, but --

10   A.    Uh-huh.

11   Q.    -- since your involvement, is there any -- are you aware

12   of any evidence in all of this that's been turned over of my

13   client distributing any pills?

14   A.    Through the proffer of McGowan.

15   Q.    Okay.  But since -- you were surveilling these folks;

16   right?

17   A.    Yes.

18   Q.    Okay.  Do you have evidence of any distribution, any

19   surveillance of him distributing pills?

20   A.    No, there was not any surveillance --

21   Q.    Okay.

22   A.    -- that shows that your client was distributing pills --

23   Q.    Okay.

24   A.    -- that I can recall.

25   Q.    And -- but you had evidence of a trip to Columbia by

## SPECIAL AGENT SMITH - CROSS-EXAMINATION

1    McGowan selling to a guy from Fayetteville; correct?

2    A.    No.

3    Q.    Who --

4    A.    Actually McGowan had sent another individual on his behalf

5    to Columbia to distribute those pills.

6    Q.    Was it Richard Longshore?

7    A.    No, it was not.

8    Q.    Okay.  Who was it?

9    A.    I believe it was Trevor Hull.

10    Q.    Okay.  Mr. Hull, co-defendant Hull?

11    A.    Yes, uh-huh.

12    Q.    Okay.  All right.  During your surveillance of my client,

13    has there ever been an instance where he's talked about fleeing

14    the country?

15    A.    There were no intercepted calls where your client talks

16    about fleeing the country, no.

17    Q.    Okay.  All right.  But there were calls or surveillance

18    that talked about them being aware they were surveilled; right?

19    A.    Yes.

20    Q.    Okay.  In fact, you just heard they took the camera in;

21    right?

22    A.    Yes.

23    Q.    And despite that -- that was when, February when?

24    A.    February the 5th.

25    Q.    February the 5th.  So three weeks later when you went to

### SPECIAL AGENT SMITH - CROSS-EXAMINATION

1  arrest him, where was he?

2  **A.**   He was at his house.

3  **Q.**   Okay.  And did you check that he had been living there for

4  21 years?

5  **A.**   I know he's lived there for quite some time.

6  **Q.**   Okay.  Is there any indication or any evidence you have of

7  my client leaving the Greenwood area during this case?

8  **A.**   No.  The focus point wasn't on your client other than his

9  relationship with McGowan, so there wasn't specific

10 surveillances set up for Mr. Longshore.

11 **Q.**   But you said -- so you were focused on McGowan, and

12 Longshore was involved because of his interaction with McGowan;

13 correct?

14 **A.**   Yes.

15 **Q.**   And they're brothers; right?

16 **A.**   Yes.

17         **MR. BOGGS:**  Okay.  And -- forgive me, Judge.  I'm

18 just trying to make sure --

19         **THE COURT:**  Take your time.

20                    (Pause.)

21 BY MR. BOGGS:

22 **Q.**   It's been stated that you met with McGowan since his

23 arrest; is that correct?

24 **A.**   Yes.

25 **Q.**   Okay.  Have you found the pill press?

## SPECIAL AGENT SMITH - CROSS-EXAMINATION

1   **A.**   We did not find the pill press.  A pill press was
2   surrendered to another attorney that we just took possession
3   of.
4   **Q.**   All right.  And who was that, and which -- from which
5   defendant did that come from?
6   **A.**   We have no idea.
7   **Q.**   Okay.  So -- so an attorney who's not representing one of
8   the co-defendants has the pill press?
9   **A.**   Had the pill press, and he is representing one of the
10  defendants.
11  **Q.**   Okay.  And who is it?
12  **A.**   The defendant is McGowan.  Ryan Beasley is the attorney.
13  **Q.**   Okay.  So the pill press -- you know where the pill press
14  is now?
15  **A.**   In my office.
16  **Q.**   Okay.  And it was given to you by McGowan?
17  **A.**   No.
18  **Q.**   Okay.
19  **A.**   It was given to us by Ryan Beasley.
20  **Q.**   Who represents McGowan?
21  **A.**   Who represents McGowan, but he did not tell us where the
22  pill press came from.
23  **Q.**   Okay.  So is there any -- but it was intimated to the
24  Court that my client when he said, "Ask my brother or ask
25  Mr. McGowan," about the pill press, it -- did you find that to

### SPECIAL AGENT SMITH - CROSS-EXAMINATION

1   be untruthful?

2   **A.**   The conversation, once we arrested McGowan and under

3   Miranda when we asked him specifically about the pill press, we

4   advised him that the pill press wasn't at the pill press

5   location where it was manufactured on Laurens -- in Laurens

6   County, and he said it was there, and we told him that it

7   wasn't, and he said his brother would have had to have moved

8   it.

9           In talking to the task force officer that arrested

10  your client --

11          THE COURT:  Hang on.  Are we having a problem?

12          ELECTRONIC SOUND RECORDER:  I think we're getting a

13  little feedback, but we're tilting it down just a little bit.

14  It just started when somebody hit a mic somewhere.  I'm not

15  sure --

16          MR. BOGGS:  I don't -- hers is on.

17          ELECTRONIC SOUND RECORDER:  Yeah, they'll all remain

18  on.

19          MR. BOGGS:  Mine --

20          THE COURT:  Well, let me see if mine --

21          MR. BOGGS:  Mine doesn't have a light, so I don't

22  know if it's -- well --

23          THE COURT:  I don't even know if mine's on.

24          MR. BOGGS:  I can't -- I can't -- is that --

25          ELECTRONIC SOUND RECORDER:  I mean, I can hear them,

## SPECIAL AGENT SMITH - CROSS-EXAMINATION

1    but there's a lot of static over your voices.  But, I mean, I
2    can hear you.  Something just happened.
3          **THE COURT:**  Is it paused right now?  Hang on just a
4    minute.  Is it paused right now or --
5                        (Recording paused.)
6          **MR. BOGGS:**  Testing 1, 2, 3.
7          **ELECTRONIC SOUND RECORDER:**  Leesa?
8          **MS. WASHINGTON:**  Testing 1, 2, 3.
9          **THE COURT:**  Witness?
10         **THE WITNESS:**  Testing 1, 2, 3.
11         **THE COURT:**  Testing.
12         **ELECTRONIC SOUND RECORDER:**  I'm not sure where it's
13   coming from, but it must be the whole system, because I'm
14   hearing it through everybody's mic.  It was the worst on yours.
15         **MR. BOGGS:**  And there's no light on.  I don't think I
16   need a mic, or do you have to have it to record?
17         **ELECTRONIC SOUND RECORDER:**  It's for court reporting.
18   It's not working.
19         **MR. BOGGS:**  Okay.
20         **THE COURT:**  Okay.  Well --
21         **MR. BOGGS:**  I'll step away.  Does that help?
22         **ELECTRONIC SOUND RECORDER:**  I can hear you.  It does
23   help.  It's not as loud in my ear.
24         **MR. BOGGS:**  I was flipping some papers, so maybe --
25   could that have been it?

## SPECIAL AGENT SMITH - CROSS-EXAMINATION

1          **ELECTRONIC SOUND RECORDER:**  No, sir.  It was crystal

2    clear until somebody hit a mic somewhere, and now, I'm not sure

3    exactly where it happened.  It's on a -- it has to be in the

4    line somewhere.

5          **THE COURT:**  Okay.

6          **MR. BOGGS:**  Judge, just so you know, this line down

7    here looks pretty frayed.

8          **THE COURT:**  Yeah.

9          **MR. BOGGS:**  It might need to be addressed --

10          **THE COURT:**  Okay.

11          **MR. BOGGS:**  -- after today.

12          **THE COURT:**  All right.

13          **MR. BOGGS:**  I mean, in terms of the courthouse folks.

14          **THE COURT:**  Okay.  I appreciate that.  Okay.  Well,

15    we're just going to have to press on.

16          **MR. BOGGS:**  Just raise your hand --

17          **THE COURT:**  I mean, we'll do the --

18          **MR. BOGGS:**  -- if there's an issue.

19          **THE COURT:**  We'll do the best we can.  Okay.  I'm

20    sorry for the interruption.

21          **MR. BOGGS:**  No, Judge, I'm --

22          **THE COURT:**  Go right ahead.

23          **MR. BOGGS:**  Understandable.

24    BY MR. BOGGS:

25    **Q.**   I'm sorry, Special Agent Smith.  You were talking about

**SPECIAL AGENT SMITH - CROSS-EXAMINATION**

1  the pill press and how under oath Mr. McGowan -- finish your
2  statement, because I think that's where we were.
3  A.    Mr. McGowan indicated at his arrest that if the pill press
4  was not there, his brother would have moved it.
5  Q.    Okay.
6  A.    Mr. Longshore.
7  Q.    And then Mr. Longshore indicated at his arrest that his
8  brother would have known where it is?
9  A.    Right, that he didn't -- he didn't move the pill press.
10  He didn't know where it was at.
11  Q.    Okay.  And then subsequent to all of that, Mr. Beasley
12  turned it over to you?
13  A.    Yes.
14  Q.    And he represents Mr. McGowan?
15  A.    He does.
16  Q.    Okay.  I'll move on.  When you arrested my client, did he
17  have a passport?
18  A.    I don't believe so.
19  Q.    Okay.  Are you aware if he has a passport?
20  A.    I do not.
21  Q.    Okay.  All right.  The kilos of substances have not been
22  tested -- or they're being tested right now; correct?
23  A.    The substances, there were several five gallon buckets
24  full of material.  I would say over 50% of everything that was
25  seized from down there did field test as heroin.  There were

**SPECIAL AGENT SMITH - REDIRECT EXAMINATION**

1    other substances that they could not field test for different
2    reasons, and they've been submitted to the lab, and we do not
3    have the lab analysis back, but at least 50% or the vast
4    majority of the substances that were seized did field test as
5    heroin.
6    **Q.**    Did you -- in your experience -- how long have you been
7    with the DEA?
8    **A.**    Almost 30 years.
9    **Q.**    In your experience, if that was the site of manufacturing,
10   could that be waste?
11   **A.**    With pills -- and I think a lot of the substance that was
12   in a liquid form had the dye, the blue dye to it.  Whether or
13   not the mass majority of that was waste or not, I can't tell.
14   I know that a large portion of it did have heroin in it.
15            **MR. BOGGS:**  I have no further questions, Judge.
16            **THE COURT:**  Okay.  All right.
17            **MS. WASHINGTON:**  Just one follow-up.
18            **THE COURT:**  Sure.
19                    **REDIRECT EXAMINATION**
20                    **BY MS. WASHINGTON:**
21   **Q.**    Special Agent Smith, you were asked whether or not the
22   focus of the investigation was on McGowan, and to the extent
23   that it shifted to Longshore, it was because they were
24   brothers.  Was that the reason your investigation shifted to
25   Longshore, because of some familial relationship that

**SPECIAL AGENT SMITH - REDIRECT EXAMINATION**

1  Mr. Longshore and Mr. McGowan had?

2  **A.**   No.   It was shifted to Mr. Longshore because every

3  surveillance that we conducted on the pill press operations,

4  Mr. Longshore was present, as well as there was I think 60

5  intercepted pertinent calls or drug-related calls between

6  McGowan and Mr. Longshore, and then most of them centered

7  around when and where they were meeting at the pill press

8  location the following days.

9  **Q.**   All right.   Regarding the pill press, the -- when did

10  Mr. Beasley contact you about turning over a pill press?

11  **A.**   We --

12  **Q.**   First contact you --

13  **A.**   Oh, goodness.

14  **Q.**   -- regarding turning the pill press -- a pill press over?

15  **A.**   Shortly after the arrest on the 26th.

16  **Q.**   And when did you take custody of it?

17  **A.**   This morning.

18  **Q.**   Okay.   Was that because you were tied up, busy, or was

19  it --

20  **A.**   I think I got a call from him around 4:00 yesterday

21  afternoon and said the pill press had been delivered to his

22  office.   He did not indicate by who, and I told him we'd make

23  arrangements because of the size of it to have people pick it

24  up this morning, and in fact that's what happened.

25  **Q.**   We're talking about this pill press as if it was -- it is

## SPECIAL AGENT SMITH – REDIRECT EXAMINATION

1   known to be the one used at the Mountville location and the

2   Laurens Road location.  Do you know that?

3   **A.**   I don't know it for a fact.  It did have blue powder on

4   it, but do I know for certainty it was the one that was used

5   down there?  No.

6   **Q.**   You don't?

7   **A.**   No.

8   **Q.**   All right.  So on the 26th was when you first had

9   discussions about turning over the press?

10   **A.**   It might have been the next day or within a couple of

11   days.  It was shortly after the 26th, yes.

12   **Q.**   Did you ever ask that it be turned over to DEA at your

13   office?

14   **A.**   Yes.

15   **Q.**   And what was the response and from whom did you get a

16   response?

17   **A.**   Mr. Beasley indicated that the people that were in

18   possession of it were probably very fearful and did not want to

19   show up to the DEA office with a fentanyl heroin pill press.

20   **Q.**   To this day, do you know who turned in this particular

21   pill press machine to Mr. Beasley?

22   **A.**   No.  I asked the agents this morning, and they were not

23   given an answer as to who delivered the pill press to

24   Mr. Beasley's office.

25         **MS. WASHINGTON:**  All right.  Thank you.

## SPECIAL AGENT SMITH – REDIRECT EXAMINATION

1          **THE COURT:**  Sir, you said in response to questions
2     that were asked that you did a proffer of Mr. McGowan.
3          **THE WITNESS:**  Yes, sir.
4          **THE COURT:**  And he indicated that Mr. Longshore did
5     distribute pills?
6          **THE WITNESS:**  Yes, sir.
7          **THE COURT:**  Okay.  All right.  Okay.  Anything
8     further?
9          **MR. BOGGS:**  Not from this witness, Judge.
10         **THE COURT:**  Okay.  Anything further?
11         **MS. WASHINGTON:**  No, Your Honor.
12         **THE COURT:**  Okay.  You're excused.  Thank you, sir.
13         (Witness excused.)
14         **THE COURT:**  Okay.  Let me ask, does the Government
15    have any other witnesses they want to call?
16         **MS. WASHINGTON:**  No, Your Honor.
17         **THE COURT:**  Okay.
18         **MS. WASHINGTON:**  That is the Government's
19    presentation.
20         **THE COURT:**  Okay.  Okay.  All right.  On the issue of
21    detention, Mr. Boggs, do you have any witnesses?
22         **MR. BOGGS:**  Judge, I -- for sake of time, I would
23    proffer what my witnesses would say.  It's in Pretrial Services
24    Report that was presented to the Court in March.  I've
25    confirmed with Ms. Pridmore that nothing has been added since

March 1st.

So, Judge, perhaps I could proffer, if you will. I will note for the record, and I recognize that my client's wife is here.

**THE COURT:** Yes, ma'am. Yes, ma'am.

**MR. BOGGS:** If you'll stand and state your name.

**DEKEELA LONGSHORE:** Hi. I'm Dekeela Longshore.

**THE COURT:** Mrs. Longshore. Yes, ma'am.

**MR. BOGGS:** His mother is here, Ms. McGowan.

**THE COURT:** Ms. McGowan.

**THE MOTHER:** Barbara McGowan.

**THE COURT:** Yes, ma'am. Thank you.

**MR. BOGGS:** And then his mother-in-law is here. If you'll state your name.

**CLAUDIA SANDERS:** Good morning. My name is Claudia Sanders.

**THE COURT:** Ms. Sanders. All right. Thank you very much.

**MR. BOGGS:** And, Judge, I'm not trying to delay things --

**THE COURT:** No, sir.

**MR. BOGGS:** -- I mean, essentially it's a summary of what's -- what was presented to the Court, and I'd like to just highlight some of those things, Your Honor.

**THE COURT:** Yes, sir.

1    **MR. BOGGS:**  First of all, my client has been married
2    19 years.  Well, I skipped the main thing.  He was born in
3    1972, so he's a little bit younger than me.  He just turned 47.
4    Judge, he's been married 19 years.  He has five children.  He's
5    been living at that same address where he was arrested for 21
6    years.  They do rent, but they've been there 21 years.
7                     He -- his only medical condition currently
8    bodily is migraine headaches, which he was last treated in
9    December and January most recent to this month.
10                     He has admitted to using marijuana as late as
11    the day before he was arrested.  And, Judge, he got his GED.
12                     His past employment, he was employed for ten
13    years prior at his last job which ended last year, and then
14    prior to that, he had a job that lasted six years after working
15    with Wal-Mart and the Heinz company down in Newberry.
16                     Judge, I just would -- as far as
17    Miss Washington's rendition of his prior record, it's -- it's
18    going to be close as to whether he has any point-countable
19    offenses.  I see on page -- I guess it would be the next to the
20    last page, there are -- there's a possession of marijuana.
21    Obviously that's from 1993.  That's old.  Possession of crack
22    with intent to distribute when he was 21.  I don't think that
23    would have any points.  False statement to police when he was
24    23.  I don't think that would apply.  The only one that may
25    apply is the trafficking charge.  He got a five-year sentence

1    in 1998.  He served -- he didn't have to do -- he tells me, and

2    I don't have proof, so I'm just offering this from what our

3    recollection is; is that he got out around 2000 and then

4    probably off probation in the 2002 range.  So that's the one

5    that might be within 15 years for point-countable, but -- and

6    then the last page, they're all -- they're all nolle pros

7    except for a CDV, which is outside the 15 years.

8              **THE COURT:**  Okay.

9              **MR. BOGGS:**  So, Judge, just by summary on that, he's

10   not -- I don't think he's a career offender under the First

11   Step Act.  I don't think that he would have the requisite

12   predicates to be a career offender, just for Your Honor's

13   assessment of his -- since it's been brought up that he's

14   facing this much time in jail, he knows he's facing 10 years

15   minimum if convicted.

16              Judge, I know the evidence sounds overwhelming,

17   and we'll deal with that.  In fact, this represents one of

18   14 -- I hold up probably 40 pages; represents one of 14 pages

19   that I'm downloading and have to print out to review with my

20   client.  While I was sitting in the previous hearings, I'll

21   tell you that out of those 40 pages, there are no more than six

22   paragraphs, six paragraphs about my client; not six pages.

23              Now, that doesn't mean the charges aren't

24   serious, but let's talk about everything she brought up, and

25   that is that it appears that Mr. McGowan, Mr. Latimer, and

Mr. Thomas and quite possibly Mr. Cunningham traveled to different states to conduct business or place orders from different business -- different people across the United States.  Now, I realize the evidence shows -- or the proposed evidence would show that my client was involved in manufacturing.  I did hear some testimony from Mr. Smith that Mr. McGowan says my client distributed.  However, if the Government is stressing how dangerous he is to the community, I just highlight that as early as 2017, Government agents -- whether state, local or what have you, and they worked together on this -- Government agents had evidence allegedly that my client sold 300 pills, but yet he went unarrested.  And I know there's investigations and things like that, but I just have trouble when the Government says he's such a bad person and so dangerous and a flight risk and all of that, but yet they waited over a year and a half to arrest him, and there he is in the same place.  It's like if he was so bad, why didn't they get him in 2017?  And that's a question that nobody can answer in this courtroom, but I just highlight -- and I don't make that lightly, Judge.  I just want to, you know, counteract the argument that he's so dangerous.  And, Judge, we're here about his -- is he a flight risk?  Is he a danger?  Will he show up for court?  And is he suitable for bond?

           Mr. Cunningham, who Mr. Smith -- co-defendant Cunningham that Mr. Smith said traveled outside the state and

actually bought and sold items got a bond of 50,000 secured
with home incarceration is my understanding, and I printed that
out, and I think that was signed on March 4th by Your Honor.

Mr. Hull, I didn't see it on there, but I recall
when I was in court for -- he got a $50,000 secured bond with
HIP.

And then Mr. Eddie Lee Childs, who is a
co-defendant, received a 25,000 unsecured HIP bond.

Judge, I -- the main players here are still in
jail.  The main players that are above my client, who were most
talked about in Miss Washington's presentation, are still in
jail.  My client, if given a bond, has a place to live.  I
don't think he -- do you have a passport?  He has no passport;
has not traveled outside the state while being surveilled.
There's no evidence that he did present that I have seen or
that have been presented to the Court.  And his family is here
to support him, and he can be monitored by the electronic
monitoring and home incarceration program.

Judge, we're not downplaying the allegations.
He is innocent until proven guilty.  I realize you hear a bunch
of evidence against him.  He's going nowhere.  He will report
for court, and the Court can ensure that with electronic
monitoring.

We'd ask for a reasonable bond.  We'd ask for
$50,000 secured since that's what Mr. Cunningham got.  If we're

assessing relative culpability, I think it's premature for the
Court to distinguish.  The Court seems to distinguish -- and
I'm not insinuating anything, Judge -- there has been two
levels set, 25 unsecured and two 50,000 secured.  For someone
in this position, I don't know the difference between 50 and
anything above secured.  I mean, it requires a $50,000
guarantee that he'll show up, and again, there's electronic
monitoring.

        I do think that since he's been using marijuana
since he's 14, I think he needs some drug treatment, and we
certainly would agree to that and drug monitoring and all of
that.

        I just would respectfully ask for a bond, Judge.
I respect where the Government is coming from.  I know this is
a high profile case.  I know they're facing time, but based on
his criminal history and even with his involvement, I don't
know where his guidelines would fall because I don't know the
weights that are assessed against him, but I would say that his
criminal history is relatively low, if not zero.

        And so --

    **THE COURT:**  Well, from a guidelines standpoint,
but --

    **MR. BOGGS:**  Yes, sir.

    **THE COURT:**  -- he certainly does have a criminal
record.

1        **MR. BOGGS:**  Oh, I -- sure, Judge.

2        **THE COURT:**  I understand your point.

3        **MR. BOGGS:**  I'm talking about in terms of where he

4   would fall on the criminal history on the guidelines.

5        **THE COURT:**  Yes.

6        **MR. BOGGS:**  And so I'm -- I'm in no way downplaying

7   it, but up until 2017, since 1998 it appears, he went almost 20

8   years based on what's been presented today, and it's not like

9   this is -- he's been -- he was the -- he wasn't even a target

10  of the investigation.

11            And, Judge, I'm not trying to insult the Court.

12  I recognize in a drug enterprise that's alleged today that you

13  need minor players.  You need people to make the pills.  I'm

14  not downplaying that.  I'm just saying, Judge, under the whole

15  view of things, he's been here all of his life in South

16  Carolina; right?  You haven't lived anywhere else?  I just

17  wanted to make sure.  And, Judge, he went 20 years before he

18  found trouble again.

19            And so I just -- if the Government, whether

20  state, local or federal, knows that he's doing bad things in

21  2017, but yet now he's too much of a danger to let out, I just

22  have a problem with that.

23            And so maybe some of this -- we aren't here to

24  Judge anybody, Judge.  I know that sounds -- we're in a

25  courtroom, but for every time you might say he's a danger in

your eyes, I just ask you to say he hasn't -- no one has been
hurt by him specifically, and there's no evidence that anyone
has died as a result of this 4812 pill.

          And, Judge, I'm readily cognizant of the dangers
of illegal drugs, but I just would ask for a bond in this case.
Thank you, Judge.

          **THE COURT:**  All right.  Thank you.  Okay.  Well, let
me say this first.  I did hear the testimony about the -- the
transaction apparently took place in 2017.  Apparently that was
something that was part of state -- an ongoing state
investigation.  Arrest wasn't made at that time, but, of
course, we're here on this indictment with the federal
authorities, if I understood the testimony correctly, coming in
after that transaction taking place as a part of their ongoing
investigation.  There have been wiretaps, video surveillance,
regular surveillance.  There's also been proffers of
co-defendants, all of which indicate that Mr. Longshore is --
the weight of the evidence against him is very strong.  He is
subject to a lengthy period of incarceration if convicted.  He
does have a prior criminal history involving drugs.  It may not
be countable from a guidelines standpoint, but from -- but from
a criminal history standpoint, it does exist.

          I'm -- the subject matter here involving the
drugs at issue is very serious.  I agree with you, Mr. Boggs,
it doesn't look like that he's a flight risk, but based on

1   everything else, I do think he is a danger to the community.

2   And for that reason, I'm going to enter an order of detention.

3          All right?  Anything further.

4          **MS. WASHINGTON:**  Nothing further from the Government,

5   Judge.

6          **THE COURT:**  All right.  Thank you very much.

7          **MR. BOGGS:**  Thank you, Your Honor.

8          **THE COURT:**  Thank you.

9

10                 * * * * * * * *

11                   **CERTIFICATE**

12          I, Tana J. Hess, CCR, FCRR, Official Court Reporter

13   for the United States District Court, District of South

14   Carolina, hereby certify that the foregoing is a true and

15   correct transcript of the electronically recorded above

16   proceedings, to the best of my ability.

17

18

19   _____

20   Tana J. Hess, CRR, FCRR, RMR
     Official Court Reporter

21

22

23

24

25